THE PEOPLE OF PUERTO RICO, Plaintiff and Appellee, v. LUIS NICOLE, Defendant and Appellant.

Nos. 14758–14760. Argued November 6, 1950.—Decided November 22, 1950.

---

[2] Cf. People v. Díaz, 60 P.R.R. 822; People v. Sánchez, 60 D.P.R. 964 (per curiam).

812

*Ildefonso Freyre* for appellant. *Vicente Géigel Polanco, Attorney General, J. Rivera Barreras, Fiscal of the Supreme Court,* and *Frank Vizcarrondo Vivas, Assistant Fiscal,* for appellee.

MR. JUSTICE SNYDER delivered the opinion of the Court.

Luis Nicole was charged with murder in the first degree in that, "acting by virtue of a common agreement and with a common purpose and design with Agustín Escapa Rivera", he killed Eduardo Figueroa Rivera. The defendant was also charged with two other offenses: (1) assault with intent to murder Julio Lacourt and (2) carrying a prohibited weapon. The cases were tried together by agreement of the parties. The defendant was convicted by a jury of murder in the second degree and of assault with intent to commit murder. He was convicted on the same evidence by the lower court on the charge of carrying a prohibited weapon. The defendant has appealed from the judgments sentencing him to 10 to 15 years in the penitentiary, 1 to 3 years in the penitentiary, and 3 months in jail, for the respective crimes for which he was convicted.

We consider first the contention of the appellant that the verdicts were contrary to the testimony and to law. This assignment of error requires us to summarize briefly the pertinent testimony.

*Salustiano Tirado* testified that Escapa, Figueroa and the defendant were in his restaurant from 10 to 10:30 on the night the events herein occurred; that Escapa was quite drunk and showed the witness a revolver and said that he had to kill Lacourt that night or Lacourt would kill him;

that the defendant told him he should not do that; and that the witness closed his restaurant about this time and the other three men left for the docks.

*Julio Rodríguez Nazario* testified that he was a watchman for the Romaguera Company at the docks; that he was about 100 meters from the pier, with a wire fence separating the two places; that at 11:05 P.M. on the night in question, he heard the defendant, Lacourt, Figueroa and Escapa, who were ten feet from the door of pier, talking in loud voices; that Lacourt, Figueroa and Escapa came to blows; that Figueroa fell to the ground and Lacourt and Escapa continued fighting; that the defendant was a little withdrawn from the other three, about ten feet; that the witness then saw the defendant looking for something on the ground; that just then there was a thing shining in the defendant's hands, and in an instant the witness heard five or six shots; that when he heard the shots, the defendant was at the place where Figueroa was lying wounded on the ground; that he saw Figueroa fall, and he felt the latter fall when he heard the shots; that he saw the thing shining in the hands of Nicole when the latter straightened up.

*Benito Pérez Cory*, another dock watchman, testified that when he heard the shots, he ran to the scene and found Figueroa and Lacourt lying beside each other, and the defendant about ten feet from them; that the defendant ran toward Concordia Street; that the witness then went up to Figueroa and asked him what happened, but the latter could not answer; that he then asked Lacourt the same question and Lacourt told him that the defendant and Escapa had shot them in a gun fight.

*Antonio Castro* testified that the next day, in helping the police to search, he found in the water at the shore line a white nickel 32 revolver with a short barrel and six spent shells. It was stipulated that this revolver was registered in the name of Escapa.

*Arnaldo Bruckman*, a detective who arrived on the scene

shortly after the shooting, found Figueroa dying, and found a 38 nickel revolver, loaded with six unexpended bullets under his body, and another 38 black revolver loaded with six unexpended bullets about five or six feet from Figueroa. There is no dispute that these 38 revolvers were of the type normally carried by the watchmen, Figueroa and Lacourt.

*Sergio Merle*, another detective, testified that he went to get the defendant at his house at 1:00 A.M. after the shooting; that the defendant told him to be calm, that he knew what it was for; that the defendant asked for Escapa; that the defendant told him to look along the stones, at the side of the pier; that he took the defendant to the police station and then went to the pier; that in searching the place the defendant had indicated to him, he found a pair of glasses, its case, a cap, a hat and a nickel plated 32 revolver with mother of pearl trim; that when he found the revolver, four bullets had been shot and one was still in the barrel; that he found it about 1 or 2 feet from the hat and glasses.

*Ricardo Martínez*, the first witness for the defense, testified that he was working on the docks the day in question; that Escapa, Financial Secretary of the Dock Workers' Union of Mayagüez, was in charge of calling the list of the dock workers that day on behalf of the union, in the absence of the defendant, the President of the union, who normally performed this task; that Escapa came in to check the personnel about 4 P. M.; that he entered through the warehouse of the dock and when he returned, Lacourt, the watchman, told him he could not pass there; that Escapa felt hurt; that he was riding on a bicycle and got off and stared at Lacourt, and then Lacourt told Escapa that if he did not like it, to wait for him at the door, when he left at 11 P. M.; that Escapa began to cry.

On cross-examination, Martínez testified that when the facts herein occurred, the defendant was President of the union of which Escapa was financial secretary and the witness was recording secretary; that on the day in question

he saw the defendant about 10:15 P.M., after the latter came back to Mayagüez from San Juan; that he was with Escapa on that day in a café from 6 to 11 P. M.; and that the defendant also took 2 or 3 drinks with them.

*Jacinto Ortiz,* testified that on the night in question Figueroa relieved him, and he delivered his revolver to Figueroa in accordance with their custom.

*Pedro Zapata,* a worker on the docks, testified as to the respective friendships between the defendant and Figueroa and the defendant and Lacourt.

*Pedro Pérez,* a dockworker, testified that he saw the defendant, Figueroa and Escapa leaving the *cafetín* of Tirado about 10:30 or 11 P. M.; that he heard the defendant and Figueroa telling Escapa to let these things go as they were not suitable for him as a father of a family; and that Escapa said that this thing was inevitable as he had been offended.

*Luis Nicole,* the defendant, testified on his own behalf that he was a friend of long standing of both Figueroa and Lacourt; that when he returned from San Juan on the night in question, he went to a café where he found Martínez and Escapa drinking; that he took a drink with Escapa who was quite drunk; that Figueroa passed by there going to work and the defendant went with him towards the dock to see if as President of the union it was necessary for him to relieve those who were working; that when he and Figueroa came near Tirado's café, Escapa overtook them in a car and invited them to take a drink; that they went into Tirado's café; that the defendant did not want to arrive at the pier drunk so he kept his drink in his mouth and went to the rear to get rid of it; that when he returned, he heard Escapa telling Figueroa that he had a question at the dock and he was going to resolve it that night even if it cost him his life; that Figueroa asked him with whom he had the question, and Escapa answered with Lacourt; that then Figueroa and the defendant advised Escapa to let it drop as he was a father of a family; that they left the *cafetín* and he and Figueroa

continued to try to persuade Escapa to drop the matter; that before they got there, they convinced him to turn back; that he and Figueroa continued to the pier; that Figueroa went to work and the defendant went to the ship to see if the men were still working there; that when he was returning to the door to go home, he heard a discussion and on going out of the door, he found Escapa and Lacourt in a discussion with Figueroa in the middle; that Figueroa told Lacourt, "give me the revolver, you are not going to take this revolver, give me the revolver"; that then Lacourt gave the revolver to Figueroa and said he did not need it; that Escapa then fired a shot and Figueroa fell to the ground, and then Lacourt drew a revolver "and there were a lot of shots"; that when these shots occurred, the defendant was 10 or 12 feet away; that he crouched on the ground to avoid being shot; that he began to yell, because after the shots, Lacourt and Escapa began to fight; that they grabbed at each other's hands in which each one had a revolver and they continued to fight until they reached the shore line, when Lacourt's revolver dropped; that they continued to fight in the sea, and Lacourt submerged Escapa; that on seeing this, the defendant got so frightened he fell and his glasses and hat fell off and he got up and ran away.

The medical testimony showed that Figueroa died of a gunshot wound; that Escapa died by drowning; and that Lacourt received several gunshot wounds.[1]

██ We think the record contains sufficient evidence to sustain the finding of the jury that the defendant, the President of the union, participated together with Escapa, financial secretary of the union, in the latter's effort to take revenge on Lacourt, a dock watchman, because Lacourt had allegedly humiliated Escapa earlier in the day while Escapa

---

[1] The record shows that Lacourt died before the trial and was therefore unavailable as a witness. However, there was no evidence as to the cause of his death, and the case before us as to him involves only a charge of assault with intent to murder him.

was temporarily performing the duties as a union official which the defendant normally performed. The testimony of the defendant that his only role in the affair was to attempt to dissuade Escapa from his purpose was not believed by the jury. We see no basis for interference with the action of the jury in resolving this conflict in the evidence.

Moreover, as the bullets in the 38 revolvers were found unexpended whereas the 32 revolvers were found as already described, the theory of the defendant would require us to find that Escapa shot six bullets and Lacourt shot four, each from a 32 revolver. (This in spite of the fact that Lacourt normally carried a 38 revolver which the defendant himself testified Lacourt had already given to Figueroa.) Yet Escapa received no bullet wound, Figueroa received one and Lacourt three. This would mean that Lacourt, a watchman who presumably was accustomed to use firearms, did not hit Escapa with his four shots, whereas Escapa who was drunk, wounded Lacourt three times and hit Figueroa once with his six shots. As against this theory, which the jury rejected, the evidence was sufficient for the jury to conclude that the only two persons who shot were Escapa and the defendant, and that one of the shots killed Figueroa and three of them wounded Lacourt. It is unnecessary for us to determine which of the shots killed Figueroa and which wounded Lacourt. Once it was established to the satisfaction of the jury that the defendant participated in the attack together with Escapa, both were equally responsible for the injuries and death caused by the various shots. *People* v. *Escobar*, 55 P.R.R. 491, 511; 1 Warren on Homicide, Perm. ed., p. 232.

■■ The appellant next complains of the order overruling his motion for a bill of particulars. This motion asked for particulars relating to the following: (1) the alleged common purpose and design with Escapa and the participation of the defendant therein; (2) whether the shot which

caused Figueroa's death was being imputed to the defendant or to Escapa.

Whether or not a bill of particulars should be granted is a matter of discretion for the trial court. Only if the record shows that a denial thereof prevented the defendant from duly preparing his defense would we be warranted in saying the lower court abused its discretion in denying the motion. *People* v. *Santos*, 69 P.R.R. 408, and cases cited. In view of the charge of common participation and of the fact that Escapa and the defendant would both be guilty irrespective of who actually fired the fatal shot, we are unable to say that the rights of the defendant were substantially prejudiced by virtue of the denial of his motion for a bill of particulars. See *People* v. *Escobar*, supra.

 The defendant also assigns as error the action of the lower court in permitting the district attorney to cross-examine Ricardo Martínez, a witness for the defendant, as to new facts not developed on direct examination. The defendant's position is that Martínez testified on direct examination solely as to an event that took place at 4 P. M., and therefore that cross-examination as to events which occurred that night, particularly to the effect that the defendant took 2 or 3 drinks at that time, was not proper under § 517, Code of Civil Procedure, 1933 ed., and *People* v. *Ramírez*, 50 P.R.R. 224.

It is true that the rule in this jurisdiction is that cross-examination is confined to the facts elicited by direct examination. But application of this rule usually depends on the discretion of the trial court as it is sometimes difficult to draw the line on this point. Moreover, at the most the rule simply means that the examining party has made the witness his own witness if cross-examination is permitted on a point wholly unrelated to the direct examination. The matter is essentially one of order of proof; and such a question must necessarily be left to the discretion of the lower court. VI Wigmore on Evidence, 3rd ed., pp. 532–73. We

see no abuse of that discretion here. We fail to see in what way the cross-examination substantially prejudiced the rights of the defendant, who testified himself that he took one or two drinks that night.

■ The next assignment is that the lower court erred in not permitting the defendant to ask Jacinto Ortiz, a witness for the defense, whether he knew if Lacourt had been in jail for carrying arms outside the dock area. The contention is that this question was proper as the district attorney had asked Ortiz on cross-examination if he knew if Lacourt had a license to carry arms authorized by the district court of Mayagüez, to which the witness had replied that he did not know. According to the defendant, an affirmative answer to this question would tend to show that Lacourt was accustomed to carrying arms, not belonging to his employer, outside the dock area and therefore could have been carrying the .32 revolver which the defendant testified belonged to Lacourt and which the People said belonged to the defendant. Assuming without deciding that this was proper redirect examination, this was not the proper manner to establish Lacourt's conviction for carrying arms. We find no error in the ruling of the lower court on this question.

■ The next error is directed to the refusal of the district court to permit Benito Pérez Cory, a witness for the government, to be recalled to the stand in order to lay a proper foundation to impeach his testimony. The appellant asserts that the principal purpose of his request was to show the witness his sworn statement before an official of the State Accident Fund and to give him an opportunity to explain the alleged differences between that statement and his testimony at the trial. The appellant had ample opportunity to lay this foundation when he was cross-examining the witness. His request for recall of the witness was addressed to the discretion of the lower court. We see no

abuse of this discretion in its refusal to recall the witness for this purpose after the testimony of several other witnesses had intervened.

█ In addition, the question is academic as the lower court admitted the document, instructing the jury that it was admitted solely to impeach the credibility of the witness. The final result was, if anything, more favorable for the defendant than he was entitled to under the law: a prior allegedly inconsistent statement by a government witness was admitted in evidence at the behest of the defendant without giving the witness a full opportunity to explain the alleged contradictions between it and his testimony. See III Wigmore, *supra*, p. 702 *et seq.*

█ Finally, the defendant complains of two short paragraphs in the instructions to the jury as to malice. The instructions were so extensive that it required 48 pages to transcribe them. The defendant did not ask for additional instructions and did not object to these paragraphs or any other part of the instructions. He cannot raise the point for the first time on appeal, particularly as the paragraphs in question, when read together with other parts of the instructions fairly state the law. *People* v. *Rodríguez*, 70 P.R.R. 21.

The judgments of the district court will be affirmed.